FILED & JUDGMENT ENTERED
Steven T. Salata

May 14 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T Beyer_
Laura T. Beyer
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Case No. 20-30845 |
| GABBIDON BUILDERS, LLC, | ) |
| | ) Chapter 11, Subchapter V |
| | ) |
| EIN:    26-3080955 | ) |
| | ) |
| Debtor. | ) |

**ORDER (I) DENYING CONFIRMATION OF THE PLAN
AND (II) CONVERTING CASE TO CHAPTER 7**

THIS MATTER having come before the Court on the Amended Chapter 11 Plan of Reorganization (Subchapter V) (the "Plan"), filed by the above-captioned debtor and debtor-in-possession (the "Debtor") on February 17, 2021 [ECF No. 98] and the Renewal of Objection to Amended Chapter 11 Plan of Reorganization (the "Objection") filed the U.S. Bankruptcy Administrator for the Western District of North Carolina ("Bankruptcy Administrator") on March 25, 2021 [ECF No. 131] and on the Trustee's Motion to Convert or Dismiss Case (the "Motion to Convert") filed on January 6, 2021 [ECF No. 77] and the joinders thereto filed by the Bankruptcy Administrator on January 20, 2021 [ECF No. 81] and by counsel to Belva and Myron Martin, Eric and Shamea Shelton, and Mukesh and Sandyha Nigam (the "Litigation

Creditors") on January 20, 2021 [ECF No. 85]. Appearances at the hearing on the Plan and the Motion to Convert, held via zoomgov.com on April 23, 2021, in person on April 30, 2021, and via Teams on May 5, 2021, were as noted in the Court's record, including Robert L. Lewis, Jr., counsel for the Debtor; Laura Budd, counsel for the Litigation Creditors; Caleb Brown, the duly appointed subchapter V trustee (the "Subchapter V Trustee"); and Shelley Abel, Bankruptcy Administrator.

Having reviewed the Plan, the Objection, the Motion to Convert and joinders thereto, the schedules, statement of financial affairs, and the monthly status reports filed by the Debtor, and the entire record in this Chapter 11 case; having heard the testimony of Leonard Gabbidon, sole owner and manager of the Debtor, and the exhibits admitted into evidence in connection with such testimony; having heard the arguments of counsel in connection with the Plan, the Objection, and the Motion to Convert; the Court finds and concludes, after notice and a hearing, as follows: (a) it has jurisdiction over the subject matter of the Motion to Convert pursuant 28 U.S.C. §§ 157 and 1334, (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (c) this matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2), (d) notice of the Plan and Motion to Convert was proper and adequate and no further or additional notice is required or necessary, and (e) a reasonable opportunity to object and to be heard regarding the relief requested in the Plan and the Motion to Convert has been afforded to all interested persons.

The Debtor sought confirmation of the Plan under section 1191(b) of the Bankruptcy Code, which requires the Debtor to show that the Plan does not discriminate unfairly and that the Plan is fair and equitable, which further requires

2

a finding by the Court that, among other things, the Plan is feasible, as required by section 1129(a)(11) made applicable to subchapter V of chapter 11 by section 1191(b). For the plan to be feasible, the Court must find that the Debtor will be able to make all the payments under the Plan or that there is a reasonable likelihood that the Debtor will be able to make all payments under the Plan. Based on consideration of the evidence and the arguments of counsel, the Court concludes that the Debtor has not proposed a feasible Plan and further concludes that the Debtor's case should be converted to chapter 7.

The Debtor's Plan proposes to sell the lot it owns at Riva Ridge Lane in Waxhaw (the "Property") and to use the net proceeds to pay creditors $10,000 each with the remainder of their claims to be paid over the balance of the Plan. The Debtor proposes to use the balance of the net proceeds to purchase a second lot in the Fountaingrove neighborhood and to build a 4,300 square foot house on that lot, which it could then sell and use those proceeds to continue to fund the Plan. However, there is no evidence to support a conclusion that the sale of the Property is imminent based on the history of the proposed sale of the Property.

The Debtor first sought approval for a proposed sale of the Property by filing the Motion for Private Sale of Real Property Outside the Ordinary Course of Business Free and Clear of Liens and Other Interest Pursuant to 11 U.S.C. § 363 (the "First Sale Motion") on October 23, 2020 [ECF No. 24], which was met with multiple objections [ECF Nos. 42, 47, and 48] and was subsequently withdrawn on November 30, 2020 [ECF No. 49]. The Debtor filed a second Motion for Private Sale of Real Property Outside the Ordinary Course of Business Free and Clear of Liens and Other

3

Interest Pursuant to 11 U.S.C. § 363 (the "Second Sale Motion") on December 8, 2020 [ECF No. 50], and further objections were filed to the Second Sale Motion as noted on the docket [ECF Nos. 53, 58, 63, 64, and 65]. The Second Sale Motion was approved over these objections at a sales price of $260,000 at a hearing held on December 18, 2020, and an order was not entered approving the Second Sale Motion until February 22, 2021 (the "Sale Order") [ECF No. 102]. The Sale Order provided that the proceeds were to be distributed to the Subchapter V Trustee and held in trust pending further order of the Court due to 3 *lis pendens* that were filed against the Property.

There is no indication on the record that the sale of the Property contemplated by the Sale Order fell through, and it was not until the hearing held on April 30, 2021, that the Court and the creditors learned of this fact. However, Mr. Gabbidon conveniently testified that there is a new contract for the sale of the Property at a sales price of $265,000, which both the Debtor and its counsel have seen, but no motion has been filed to sell the Property. No contract was produced or introduced into evidence, even though the Debtor states that the sale of the Property is expected to close in May 2021.

Assuming the Debtor sells the Property, the Plan then depends on the Debtor purchasing a lot in the Fountaingrove neighborhood for $60,000, building a 4,300 square foot home, and selling the home at a substantial profit. There is no evidence of the existence of this vacant lot or the ability of the Debtor to purchase it for this price other than Mr. Gabbidon's testimony, but, even if the lot does exist and the Debtor is able to purchase it, Mr. Gabbidon's testimony about construction of the home and the cost involved was confusing, contradictory, and simply unreliable.

4

Mr. Gabbidon testified that he determined the projected cost of constructing this home based on the amount at which he hopes to sell the home. In addition, Mr. Gabbidon testified that the costs will be low because "we" are building it. It is unclear who "we" is since Mr. Gabbidon also testified that the Debtor does not have any employees. He testified that the Debtor's non-debtor affiliates, Gabbidon Engineering, LLC ("Gabbidon Engineering") and Gabbidon Electrical, LLC ("Gabbidon Electrical"), would do some of the work, but he also indicated that Gabbidon Engineering is not licensed to do work in North Carolina. At the same time, he testified that it is the Debtor's practice to employ subcontractors for its construction work – for multiple reasons, including liability and the Debtor's fluctuating amount of work. The Debtor's use of subcontractors was also reflected in the Debtor's tax returns as reviewed during Mr. Gabbidon's testimony.

The testimony regarding the Debtor's construction cost worksheet for building the Fountaingrove house simply did not make sense. The Debtor's construction cost worksheet, Debtor's Exhibit F, reflects a cost of $5,000 for the HVAC, but Mr. Gabbidon testified that the actual cost would be closer to $29,000. He indicated that the HVAC units are stored somewhere, but, when asked if they belonged to the Debtor, he testified that they were not "tagged" as being owned by any particular entity and that the Debtor and its non-debtor affiliates do not label their inventory, which is troubling in and of itself. Mr. Gabbidon offered similar testimony regarding other projected costs in the Debtor's construction cost projection worksheet. For these reasons, the Court cannot conclude that the Debtor's forecast of the costs to build the Fountaingrove house is reliable for purposes of confirming the Plan.

5

Finally, the Debtor relied on its Exhibit H, the Market Analysis Summary of home sales in the Fountaingrove neighborhood, to forecast what the Debtor might receive upon the sale of the house, but this exhibit is hearsay, as was Mr. Gabbidon's testimony about what the realtor, Shellie Stubbs, told him about home sales in that area. For this reason, the Court cannot reasonably conclude that testimony is reliable.

In addition to testifying about income that the Debtor plans to generate from the sale of the Property and the construction of a new home, Mr. Gabbidon testified, and the Plan proposes, that the Debtor would use the operating income generated by the business from its other construction projects to pay its creditors $6,355 every month beginning in May 2021. Mr. Gabbidon recognized in his testimony that the Debtor's recent past performance has been dismal because of the COVID-19 pandemic, but he expects all of that to suddenly change in May. Now, he says, "business is booming, and things are very good"; however, the Debtor's predictions about its future operating income are simply not reliable given the Debtor's historical performance, including during this bankruptcy case, and the Debtor's inability to properly manage its business affairs. The best evidence of this is found in the Debtor's monthly operating reports filed on the docket, which reflect that during the 7-month period in which the Debtor has been in bankruptcy, its total net cash flow was $15,778.61, yet it proposes to start making monthly payments of $6,355 to its creditors in May, while its highest monthly net cash flow during the bankruptcy was $7,750 in September which did not include any payments to its creditors.

In addition, there is no evidence to support the Debtor's predictions of its future income as indicated on its Exhibit A. That exhibit indicates that the Debtor will start

6

receiving income in May from work on the Lempira restaurant in Charlotte that the Debtor forecasts would bring in $6,250 per month and the Pollo Compero restaurant in Raleigh, which the Debtor forecasts would bring in $11,000 per month. With respect to Pollo Compero in Raleigh, based on Mr. Gabbidon's testimony, the Debtor first submitted its plans for approval by the city of Raleigh over one year ago. The emails from Ms. Bardeschewski, the Debtor's expeditor, introduced into evidence as Debtor's Exhibit D, and Mr. Gabbidon's testimony confirm that the Debtor has had to resubmit the plans several times, and those emails confirm that the plans still require resubmission. There is no reason for the Court to conclude or believe that construction will begin on the Pollo Compero project in May. With respect to Lempira in Charlotte, Mr. Gabiddon testified that the permit has expired for that project for the work to be done, but he also forecast that work is scheduled to begin in May. Aside from this, the Debtor introduced no contract or other evidence to substantiate the income projected for these projects.

A common theme and problem with the Debtor's income projections is its failure to take into consideration the necessary expense of generating the income. On this point, Mr. Gabbidon testified that the Debtor will not pay for the necessary labor and materials to perform work on projects – that this will be up to the owner for whom the Debtor is performing work. This testimony is contradicted by the Debtor's monthly operating reports, including, for example, the November 2020 monthly operating report filed on April 6, 2021 [ECF No. 145] and the exhibit D attached thereto, which reflects cash disbursements by the Debtor in five different entries for Pollo Compero expenses. Mr. Gabbidon explained that there is no fixed amount for

7

construction costs so it is not wise to include those in the Debtor's monthly operating expenses. Considering Mr. Gabbidon's conflicting testimony, the Court cannot conclude that the Debtor's income projections are reliable when they fail to include the expenses related to performing the work necessary to generate the income.

Mr. Gabbidon would have the Court and the Debtor's creditors believe that the Debtor's poor past performance can be entirely blamed on the COVID-19 pandemic. Mr. Gabbidon uses COVID as a convenient excuse. Mr. Gabbidon would have the Court believe that all construction has come to a halt during COVID and that all contractors have been affected in this way, but that is simply not the case. Mr. Gabbidon's testimony was even contradictory and self-serving on this point. When forecasting his ability to construct and sell a home in the Fountaingrove neighborhood, he testified that the housing market is booming, and he predicted he could sell this house before it ever came on the market.

Based on the evidence, the Court concludes that the more likely explanation for the Debtor's poor financial performance is the Debtor's poor management of its business, including commingling of funds with non-debtor affiliates Gabbidon Electrical and Gabbidon Engineering, lack of observation of corporate formalities between these three entities, the use of business bank accounts to pay personal expenses, the inability to properly project income and expenses generally, and the inability to properly project costs relating to construction projects. While the Court does not know, it suspects that those same problems led to the three lawsuits that are pending in state court against the Debtor by couples who had contracted with the Debtor to construct residential homes.

The Court is not sufficiently convinced that these problems have been cured to conclude that the Debtor has proposed a feasible plan and that the business will experience a complete turnaround in the single month of May so that it can make the payments required by the Plan to begin in May. For all the foregoing reasons, the Court concludes that the Plan cannot be confirmed as proposed and therefore confirmation must be denied.

Turning to the Motion to Convert, in those cases when it is "apparent that the debtor has no profitable core around which to structure its reorganization effort, or that the debtor cannot or will not formulate a reasonable business plan," then "there is often little reason to proceed with the reorganization." 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii] (16th ed.). Section 1112(b) of the Bankruptcy Code provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." Cause includes gross mismanagement of the estate and substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation pursuant to 11 U.S.C. § 1112(b)(4).

The Court finds and concludes that cause exists to convert this case to Chapter 7 for the reasons set forth in the Motion to Convert and those outlined in these findings of fact and conclusions of law, including but not limited to: (i) the Debtor has no profitable core around which to structure its reorganization effort, (ii) the Debtor's cash position throughout this case has been precarious, causing the potential dividend to creditors to diminish since the Petition Date, and no competent evidence suggests that the Debtor's cash position will improve, (iii) the Debtor's repeated

9

failure to account for expenses and building costs in its ongoing business operations indicates it is not equipped to become profitable or to safeguard the estate, and (iv) the Debtor's failure to timely apprise the Court of its dealings with its assets calls into question whether the Debtor has been proceeding with the diligence required of a Chapter 11 debtor. Considering these circumstances, the Court concludes that the Debtor has engaged in gross mismanagement of the estate, there has been a diminution of the estate, and there is not a reasonable likelihood of rehabilitation.

The Court further finds and concludes that conversion is in the best interest of creditors and the estate so that a chapter 7 trustee can liquidate the Property and distribute the proceeds and the Debtor's funds on hand, as well as any further recoveries, for the benefit of creditors.

NOW, THEREFORE, IT IS ORDERED that:

A. Confirmation of the Plan is **DENIED**;

B. The Motion to Convert is **GRANTED**;

C. Cole Hayes is appointed chapter 7 trustee (the "Chapter 7 Trustee");

D. All persons (as such term is defined in 11 U.S.C. § 101(41)) who receive a copy of this Order or have actual notice of this Order are directed to promptly comply with the provisions of 11 U.S.C. § 542(a);

E. Without limiting the Debtor's obligations under 11 U.S.C. § 521, all persons (as such term is defined in Bankruptcy Code § 101(41)) who receive a copy of this Order or have actual notice of this Order shall cooperate with the Chapter 7 Trustee as necessary to enable the Chapter 7 Trustee to perform his duties under the Bankruptcy Code; and

F. The Honorable Laura Turner Beyer shall continue to be assigned as Judge for the above-captioned case after its conversion to Chapter 7.

*This Order has been signed electronically.* *United States Bankruptcy Court*
*The Judge's signature and Court's seal*
*appear at the top of this Order.*

11